2019R01117/RY

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| | : | Crim. No. |
| v. | : | |
| | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 1347 |
| REYAD SALAHALDEEN, | : | 18 U.S.C. § 371 |
| MOHAMAD MUSTAFA, and | : | 42 U.S.C. § 1320a-7b |
| TRAVORES WILLS | : | 18 U.S.C. § 2 |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

1.    Unless otherwise indicated, at all times relevant to this Indictment:

### Individuals and Entities

a.    Defendant REYAD SALAHALDEEN was a resident of Georgia, Texas, and Washington.

b.    Defendant MOHAMAD MUSTAFA was a resident of Georgia.

c.    Defendant TRAVORES WILLS was a resident of Alabama and an owner and operator of Allergy Solutions System LLC ("Allergy Solutions"), a company that purported to market genetic testing.

d.    Express Diagnostics, LLC ("Express Diagnostics") was a New Jersey limited liability company, located in East Brunswick, New Jersey, that purported to serve as a diagnostic testing laboratory. Beginning in or around 2018, REYAD SALAHALDEEN controlled Express Diagnostics.

e.     BioConfirm   Laboratory   USA,   LLC   and   BioConfirm Laboratories, LLC (collectively, "BioConfirm") were Georgia limited liability companies located in Doraville, Georgia, that together purported to serve as a diagnostic testing laboratory. Beginning in or around October 2017, REYAD SALAHALDEEN and MOHAMAD MUSTAFA controlled and operated BioConfirm.

f.     Tox Management, LLC (d/b/a "Accurate DX") was a Texas limited liability company, located in San Antonio, Texas, that purported to serve as a diagnostic testing laboratory. Beginning in or around 2019, REYAD SALAHALDEEN controlled and operated Accurate DX.

g.     Tri-State Toxicology, LLC (d/b/a "Definitive DX") was a Texas limited liability company, located in San Antonio, Texas, that purported to serve as a diagnostic testing laboratory. Beginning in or around 2019, REYAD SALAHALDEEN controlled and operated Definitive DX.

h.     Express Diagnostics, BioConfirm, Accurate DX, and Definitive DX are collectively referred to herein as the "Laboratories."

i.     Brothers Consulting, LLC ("Brothers"), was a Georgia limited liability company owned and operated by REYAD SALAHALDEEN.

j.     Co-Conspirator 1 was a resident of Georgia and an owner and operator of Marketing Company 1, a company that purported to market genetic testing.

k.     Co-Conspirator 2 was a resident of Georgia and an owner and operator of Marketing Company 2, a company that purported to market genetic testing.

## The Federal Health Insurance Programs

l.     The Medicare Program ("Medicare") was a federally-funded health care program that provided free or below-cost benefits to certain individuals, primarily the elderly, blind, or disabled. The benefits available under Medicare were governed by federal statutes and regulations. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services ("HHS"). Individuals who received Medicare benefits were referred to as Medicare "beneficiaries."

m.     The Georgia Medicaid Program ("Georgia Medicaid") was jointly funded by the federal and state governments and was a program that provided benefits to certain low-income individuals and families in Georgia. Georgia Medicaid was administered by CMS and the Georgia Department of Community Health ("DCH").

n.     The Colorado Medicaid Program ("Colorado Medicaid") was jointly funded by the federal and state governments and was a program that provided benefits to certain low-income individuals and families in Colorado. Colorado Medicaid was administered by CMS and the Colorado Department of Health Care Policy and Financing ("HCPF").

o.     Georgia Medicaid and Colorado Medicaid are collectively referred to herein as "Medicaid."

p.     Medicare and Medicaid were each a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and a

"health care benefit program" as defined in Title 18, United States Code, Section 24(b), and Title 18, United States Code, Section 220(e)(3).

q.   Medicare was divided into four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Part B was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

r.   Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided items and services to Medicare beneficiaries were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

s.   When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted to Medicare seeking reimbursement were required to include: (i) the beneficiary's name and Health Insurance Claim Number ("HICN"); (ii) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (iii) the name of the provider, as well as the provider's unique

identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare were able to be submitted in hard copy or electronically.

t.     Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

u.     To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

v.     In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or

fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

      w.    Medicare and Medicaid paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare and Medicaid. Medicare and Medicaid would not pay for items or services that were procured through kickbacks and bribes.

      i.    In certain limited circumstances, Medicare permitted laboratories to establish arrangements with so-called "reference laboratories." Such arrangements existed when a laboratory received a specimen for testing, but instead of testing the specimen in-house, the laboratory acted as a "referring laboratory" by sending the specimen to another laboratory, the "reference laboratory," to complete the testing. Pursuant to Title 42, United States Code, Section 1833(h)(5)(A), a referring laboratory was permitted to bill Medicare for tests performed by a reference laboratory so long as the referring laboratory met one of the following conditions: (i) the referring laboratory was located in, or was part of, a rural hospital; (iii) the referring laboratory was wholly owned by the entity performing such test, the referring laboratory wholly owned the entity performing such test, or both the referring laboratory and the entity performing such test were wholly owned by a third party; or (iii) the referring laboratory did not refer more than 30 percent of the clinical laboratory test for which it received requests for testing during the given calendar year.

### The Commercial Health Insurance Programs

x.      Commercial Insurer 1, Commercial Insurer 2, Commercial Insurer 3, and Commercial Insurer 4 (collectively, the "Commercial Insurers") were health insurance companies that offered individual and group health benefit plans under which members could obtain coverage for health care items and services.

y.      Each of the Commercial Insurers was a "health care benefit program" as defined in Title 18, United States Code, Section 24(b), and Title 18, United States Code, Section 220(e)(3).

z.      The Commercial Insurers often made payments directly to laboratories and other health care providers, rather than to the beneficiary who received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

aa.      To obtain payment for treatment or services provided to a beneficiary, laboratories and other health care providers had to submit itemized claim forms to the beneficiary's commercial insurance plan. The claim forms were typically submitted electronically. The claim form required certain important information, including: the beneficiary's name and HICN or other identification number; a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; the billing codes for the benefit, item, or service; the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and the name of the referring physician or other health care provider, as well as the UPIN or NPI.

bb.   When a provider submitted a claim to the Commercial Insurers, the provider certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with applicable laws and regulations. The provider also certified that the items or services being billed were medically necessary and were in fact provided as billed.

### Genetic Testing

cc.   Cancer genetic tests ("CGx tests") were laboratory tests that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Pharmacogenetic tests ("PGx tests") were laboratory tests that used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications, and, together with CGx tests, were referred to as "genetic testing." Neither type of genetic testing was a method of diagnosing whether an individual had a disease, such as cancer, at the time of the test.

dd.   To conduct genetic testing, a laboratory must obtain a DNA sample from the patient. Such samples were typically obtained from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile. The genetic sample was then submitted to the laboratory to conduct a CGx or a PGx test.

ee.   DNA samples were submitted along with requisitions that identified the patient, the patient's insurance, and the specific test to be performed, such as a comprehensive panel of genes to test for risks of multiple cancers. In order for laboratories to submit claims to Medicare, Medicaid, and

the Commercial Insurers for genetic tests, the requisitions had to be signed by a doctor or other authorized medical professional who attested to the medical necessity of the test. Requisitions with the doctor's signature or other authorized medical professional's signature were known as "physicians' orders."

ff.    Medicare did not cover diagnostic testing, including CGx and PGx testing, that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.* Medicaid and the Commercial Insurers likewise covered only diagnostic testing, including CGx and PGx testing, that was reasonable and medically necessary.

gg.    If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a), provided that "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific

medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

<u>**COUNT ONE**</u>
**Conspiracy to Commit Health Care Fraud and Wire Fraud**

2.      Paragraph 1 of the Indictment is realleged and incorporated by reference as though fully set forth herein.

3.      From in or around 2018, and continuing through in or around August 2020, in the District of New Jersey and elsewhere, the defendant,

REYAD SALAHALDEEN,

did knowingly and willfully combine, conspire, confederate, and agree with Co-Conspirator 1, Co-Conspirator 2, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.      to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid, and the Commercial Insurers, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347; and

b.      to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property

by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and to knowingly and intentionally transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, contrary to Title 18, United States Code, Section 1343.

**Goal of the Conspiracy**

4.  It was the goal of the conspiracy for defendant REYAD SALAHALDEEN and his co-conspirators to unlawfully enrich themselves and others by, among other things, (a) submitting and causing the submission of false and fraudulent claims to Medicare, Medicaid, and the Commercial Insurers for items and services that were ordered or provided through illegal kickbacks and bribes; (b) submitting and causing the submission of false and fraudulent claims to Medicare, Medicaid, and the Commercial Insurers for services that were medically unnecessary, ineligible for reimbursement, and not provided as represented; (c) concealing the submission of false and fraudulent claims to Medicare, Medicaid, and the Commercial Insurers and the receipt and transfer of the proceeds of the fraud; and (d) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

### Manner and Means of the Conspiracy

5.     The manner and means by which defendant REYAD SALAHALDEEN and his co-conspirators sought to accomplish the goal of the conspiracy included, among others, the following:

a.     It was part of the conspiracy that REYAD SALAHALDEEN caused to be submitted a Medicare Enrollment Application on behalf of Express Diagnostics in which he certified that he understood payment of claims was conditioned upon the underlying claims complying with the federal anti-kickback statute, and in which he falsely certified that he would abide by all applicable Medicare laws, regulations, and program instructions, and that he would not knowingly present or cause to be presented false or fraudulent claims.

b.     It was further part of the conspiracy that REYAD SALAHALDEEN, Co-Conspirator 1, Co-Conspirator 2, and others, known and unknown to the Grand Jury, obtained access to thousands of beneficiaries' insurance information and DNA material by targeting them with marketing campaigns that included telemarketing, door-to-door solicitation, appearances at health fairs, and other methods of in-person solicitation.

c.     It was further part of the conspiracy that REYAD SALAHALDEEN, Co-Conspirator 1, Co-Conspirator 2, and others, known and unknown to the Grand Jury, induced beneficiaries to provide buccal swabs for purposes of having genetic testing performed on the resulting DNA samples without regard to whether or not the tests were medically necessary, and without the involvement of a health care professional who was treating the beneficiary.

d.    It was further part of the conspiracy that REYAD SALAHALDEEN, Co-Conspirator 1, Co-Conspirator 2, and others, known and unknown to the Grand Jury, obtained fraudulent orders for genetic testing by causing licensed providers to approve laboratory test requisitions, in some instances through telemedicine consultations, even though the licensed providers were not treating the beneficiaries for cancer, symptoms of cancer, or any other medical condition, did not use the test results in the treatment of the beneficiaries, and did not conduct a patient visit or consultation that would justify approval of the orders for genetic testing on the beneficiaries.

e.    It was further part of the conspiracy that REYAD SALAHALDEEN paid and caused the payment of illegal kickbacks and bribes through the Laboratories, Brothers, and other entities to (i) Co-Conspirator 1 through Marketing Company 1, (ii) Co-Conspirator 2 through Marketing Company 2, and (iii) other individuals and purported marketing companies, known and unknown to the Grand Jury, in exchange for fraudulent orders and DNA samples collected from beneficiaries that were used to support false and fraudulent claims from the Laboratories to Medicare, Medicaid, and the Commercial Insurers.

f.    It was further part of the conspiracy that REYAD SALAHALDEEN and others, known and unknown to the Grand Jury, created sham contracts, invoices, and other documentation that disguised the illegal kickbacks and bribes as payments for purported marketing services. In truth and in fact, REYAD SALAHALDEEN agreed to pay Co-Conspirator 1, Co-

Conspirator 2, and others, known and unknown to the Grand Jury, a per-sample fee for each beneficiary, DNA sample, and fraudulent order they referred for genetic testing to the Laboratories in exchange for their recruitment and referral of said beneficiaries, DNA samples, and fraudulent orders, all regardless of whether the genetic testing was medically necessary.

g.     It was further part of the conspiracy that REYAD SALAHALDEEN caused the payment of kickbacks and bribes through Co-Conspirator 1, Co-Conspirator 2, and others, known and unknown to the Grand Jury, to licensed providers, including telemedicine providers, in exchange for the providers approving fraudulent orders for genetic testing that were referred to the Laboratories.

h.     It was further part of the conspiracy that REYAD SALAHALDEEN, his co-conspirators, and others known and unknown to the Grand Jury, falsified and altered laboratory requisition forms, letters of medical necessity, and chart notes, including by falsifying providers' signatures and adding false diagnoses, in order to falsely represent the medical necessity of the genetic.

i.     It was further part of the conspiracy that REYAD SALAHALDEEN, his co-conspirators, and others known and unknown to the Grand Jury, operated BioConfirm and Express for the primary purpose of billing for genetic testing rather than to serve as functioning laboratories; and to facilitate that operation, caused all CGx samples received at BioConfirm to be sent to a reference laboratory for testing, such that the Laboratories' billing

Medicare far exceeded the 30% limit on referencing of tests established by federal law.

> j. It was further part of the conspiracy that REYAD SALAHALDEEN, his co-conspirators, and others known and unknown to the Grand Jury, caused the Laboratories to submit to Medicare, Medicaid, and the Commercial Insurers, by interstate wire communication, approximately $522 million in claims that falsely and fraudulently represented that genetic testing was medically necessary and eligible for reimbursement.

> k. As a result of the false and fraudulent claims, Medicare, Medicaid, and the Commercial Insurers made payments to the Laboratories in the approximate amount of at least $84 million.

> l. It was further part of the conspiracy that REYAD SALAHALDEEN, his co-conspirators, and others, known and unknown to the Grand Jury, used the fraud proceeds received from the Laboratories to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH THREE
### Health Care Fraud

6. Paragraph 1 of this Indictment is realleged and incorporated by reference as though fully set forth herein.

7. From in or around 2018 and continuing through in or around August 2020, in the District of New Jersey and elsewhere, the defendant,

REYAD SALAHALDEEN,

in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, a health care benefit program as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, by submitting and causing the submission of false and fraudulent claims for cancer genetic tests that were ordered and provided through illegal kickbacks and bribes, medically unnecessary, ineligible for reimbursement, and not provided as represented.

### Goal of the Scheme and Artifice

8.     The Grand Jury realleges and incorporates by reference Paragraph 4 of this Indictment as a description of the goal of the scheme and artifice.

### The Scheme and Artifice

9.     The Grand Jury realleges and incorporates by reference Paragraph 5 of this Indictment as a description of the scheme and artifice.

### Executions of the Scheme and Artifice

10.     On or about the dates specified below, in the District of New Jersey and elsewhere, defendant REYAD SALAHALDEEN, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, submitted and caused to be submitted the following false and fraudulent claims to Medicare for genetic tests that were ordered and provided through illegal kickbacks and bribes, medically unnecessary, not eligible for reimbursement, and not provided as represented, in an attempt to execute, and in execution of,

the scheme as described in Paragraphs 4 through 9, with each execution set forth below forming a separate count:

| Count | Medicare Beneficiary | Approximate Claim Submission Date | Approximate Amount Billed to Medicare | Approximate Amount Paid by Medicare |
|-------|---------------------|-----------------------------------|---------------------------------------|-------------------------------------|
| 2 | S.B. | 5/6/19 | $21,146 | $4,703 |
| 3 | S.W. | 2/27/19 3/28/19 | $24,143 | $4,867 |

All in violation of Title 18, United States Code, Section 1347 and Section 2.

## COUNT FOUR
### Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks

11.     Paragraph 1 of this Indictment is realleged and incorporated by reference as though fully set forth herein.

12.     From in or around 2018 through the present, in the District of New Jersey and elsewhere, the defendants,

REYAD SALAHALDEEN,
MOHAMAD MUSTAFA, and
TRAVORES WILLS,

did knowingly and willfully combine, conspire, confederate, and agree with each other, Co-Conspirator 1, Co-Conspirator 2, and others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to defraud the United States by cheating the United States government or any of its agencies out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means,

the lawful government functions of HHS in its administration and oversight of Medicare and Medicaid; and

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by soliciting and receiving any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program;

c.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by soliciting and receiving any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program;

d.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program;

e.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, or ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program;

f.      to violate Title 18, United States Code, Section 220(a)(1), by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring a patient and patronage to a laboratory, with respect to services covered by a health care benefit program, in and affecting interstate commerce; and

g.      to violate Title 18, United States Code, Section 220(a)(2)(A), by paying and offering any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to induce a referral of an individual to a laboratory, with respect to services covered by a health care benefit program in and affecting interstate commerce.

### Goal of the Conspiracy

13.    It was the goal of the conspiracy for defendants REYAD SALAHALDEEN, MOHAMAD MUSTAFA, TRAVORES WILLS, and their co-conspirators to unlawfully enrich themselves and others by, among other things, (a) soliciting, receiving, offering, and paying kickbacks and bribes in return for recruiting and referring beneficiaries to the Laboratories; (b) offering and paying kickbacks and bribes to licensed providers, including telemedicine providers, in

exchange for approving fraudulent orders for genetic testing for beneficiaries; (c) submitting and causing the submission of claims to Medicare, Medicaid, and the Commercial Insurers for genetic testing that were procured through kickbacks and bribes; (d) concealing the submission of false and fraudulent claims to Medicare, Medicaid, and the Commercial Insurers; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### **Manner and Means of the Conspiracy**

14.    The manner and means by which defendants REYAD SALAHALDEEN, MOHAMAD MUSTAFA, and TRAVORES WILLS and their co-conspirators sought to accomplish the goal of the conspiracy included, among others, the following:

a.    It was part of the conspiracy that REYAD SALAHALDEEN and MOHAMAD MUSTAFA paid and caused the offer and payment of kickbacks and bribes through the Laboratories, Brothers, and other entities to (i) Co-Conspirator 1 through Marketing Company 1, (ii) Co-Conspirator 2 through Marketing Company 2, (iii) TRAVORES WILLS through Allergy Solutions, and (iv) other individuals and purported marketing companies, known and unknown to the Grand Jury, in exchange for DNA samples collected from beneficiaries and fraudulent orders for genetic testing from health care providers, all of which were used to support false and fraudulent claims to Medicare, Medicaid, and Commercial Insurers from the Laboratories.

b.     It was further part of the conspiracy that TRAVORES WILLS, Co-Conspirator 1, Co-Conspirator 2, and others, known and unknown to the Grand Jury, solicited and received kickbacks and bribes from REYAD SALAHALDEEN and MOHAMAD MUSTAFA, in exchange for obtaining DNA samples from beneficiaries and ordering and arranging for ordering genetic testing by health care providers, knowing that the Laboratories would bill health care benefit programs for said testing.

c.     It was further part of the conspiracy that REYAD SALAHALDEEN and MOHAMAD MUSTAFA caused the payment of kickbacks and bribes through TRAVORES WILLS, Co-Conspirator 1, Co-Conspirator 2, and others, known and unknown to the Grand Jury, to health care providers, including telemedicine providers, in exchange for the providers approving fraudulent orders for genetic testing that the Laboratories billed to Medicare, Medicaid, and the Commercial Insurers.

d.     It was further part of the conspiracy that TRAVORES WILLS engaged and paid individuals to solicit DNA samples from beneficiaries for the purpose of performing genetic testing, and that TRAVORES WILLS referred these samples to laboratories controlled by SALAHALDEEN and MUSTAFA in exchange for kickbacks and bribes.

e.     It was further part of the conspiracy that TRAVORES WILLS paid kickbacks and bribes to providers in exchange for approving fraudulent orders for genetic testing that the Laboratories billed to Medicare, Medicaid, and the Commercial Insurers.

f.     It was further part of the conspiracy that REYAD SALAHALDEEN, MOHAMAD MUSTAFA, TRAVORES WILLS, their co-conspirators, and others known and unknown to the Grand Jury, caused the Laboratories to submit to Medicare, Medicaid, and the Commercial Insurers, by interstate wire communication, approximately $522 million in claims that falsely and fraudulently represented that genetic testing was medically necessary and eligible for reimbursement, and that were procured by illegal kickbacks and bribes.

g.     As a result of the false and fraudulent claims, Medicare, Medicaid, and the Commercial Insurers made payments to the Laboratories in at least the approximate amount of $84 million.

h.     It was further part of the conspiracy that REYAD SALAHALDEEN, MOHAMAD MUSTAFA, TRAVORES WILLS, their co-conspirators, and others, known and unknown to the Grand Jury, used the fraud proceeds received from the Laboratories to benefit themselves and others, and to further the fraud.

## Overt Acts

15.     In furtherance of the conspiracy, and to accomplish goal, at least one of the conspirators committed, and caused to be committed, in the District of New Jersey and elsewhere, at least one of the following overt acts, among others:

a.     In or around January 2019, REYAD SALAHALDEEN caused to be submitted a Medicare Enrollment Application on behalf of Express

22

Diagnostics in which he certified that he understood payment of claims was conditioned upon the underlying claims complying with the anti-kickback statute, and in which he falsely certified that he would abide by all applicable Medicare laws, regulations, and program instructions, and that he would not knowingly present or cause to be presented false or fraudulent claims.

b.    In or around March 2019, REYAD SALAHALDEEN and MOHAMAD MUSTAFA caused the payment of an illegal kickback and bribe to Co-Conspirator 1 by executing and causing the execution of a check from Express Diagnostics' bank account ending in x3492 to Marketing Company 1 in the approximate amount of $89,700.

c.    In or around May 2019, REYAD SALAHALDEEN and MOHAMAD MUSTAFA caused the payment of an illegal kickback and bribe to Co-Conspirator 1 by executing and causing the execution of a check from Express Diagnostics' bank account ending in x3492 to Marketing Company 1 in the approximate amount of $21,750.

d.    In or around May 2019, REYAD SALAHALDEEN executed a sham contract with Co-Conspirator 1 in which BioConfirm agreed to pay Marketing Company 1 the sum of $108,750 on a bi-weekly basis for, among other things, purported "[m]arketing and brand awareness services" and "[l]ogistics management services," when in truth and in fact, the payment amount represented a per-sample fee for the projected number of CGx and PGx samples that Co-Conspirator 1 would supply to BioConfirm.

e.      In or around July 2019, TRAVORES WILLS caused to be deposited into Allergy Solutions' bank account ending in x6029 a check from Express Diagnostics in the approximate amount of $263,750, which represented the payment of an illegal kickback and bribe.

f.      In or around August 2019, TRAVORES WILLS caused to be deposited into Allergy Solutions' bank account ending in x6029 a check from Express Diagnostics in the approximate amount of $134,500, which represented the payment of an illegal kickback and bribe.

g.      In or around October 2019, REYAD SALAHALDEEN and MOHAMAD MUSTAFA caused the payment of an illegal kickback and bribe to Co-Conspirator 1 by executing and causing the execution of a check from Express Diagnostics' bank account ending in x3492 to Marketing Company 1 in the approximate amount of $108,750.

h.      In or around December 2019, REYAD SALAHALDEEN caused the payment of an illegal kickback and bribe to Co-Conspirator 2 by executing and causing the execution of a check from Express Diagnostics' bank account ending in x3492 to Marketing Company 2 in the approximate amount of $75,500.

All in violation of Title 18, United States Code, Section 371.

### COUNTS FIVE THROUGH TEN
### Payment of Kickbacks

16.      Paragraph 1 of this Indictment is realleged and incorporated by reference as though fully set forth herein.

17.      On or about the approximate dates set forth below, in the District of New Jersey and elsewhere, the defendants, as specified in each count below, did

knowingly and willfully offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, as set forth below:

| Count | Defendant | Date | Originating Account | Payee | Amount |
|---|---|---|---|---|---|
| 5 | REYAD SALAHALDEEN and MOHAMAD MUSTAFA | 3/21/19 | Express Diagnostics | Marketing Company 1 | $89,700 |
| 6 | REYAD SALAHALDEEN and MOHAMAD MUSTAFA | 5/10/19 | Express Diagnostics | Marketing Company 1 | $21,750 |
| 7 | REYAD SALAHALDEEN and MOHAMAD MUSTAFA | 7/5/19 | Express Diagnostics | Allergy Solution Systems | $263,750 |
| 8 | REYAD SALAHALDEEN and MOHAMAD MUSTAFA | 8/12/19 | Express Diagnostics | Allergy Solution Systems | $134,500 |
| 9 | REYAD SALAHALDEEN and MOHAMAD MUSTAFA | 10/2/19 | Express Diagnostics | Marketing Company 1 | $108,750 |
| 10 | REYAD SALAHALDEEN | 12/24/19 | Express Diagnostics | Marketing Company 2 | $75,500 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Section 2.

## COUNTS ELEVEN THROUGH TWELVE
### Receipt of Kickbacks

18.    Paragraph 1 of this Indictment is realleged and incorporated by reference as though fully set forth herein.

19.    On or about the approximate dates set forth below, in the District of New Jersey and elsewhere, the defendant,

TRAVORES WILLS,

did knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, as set forth below:

| Count | Date | Originating Account | Payee | Amount |
|-------|------|---------------------|-------|--------|
| 11 | 7/5/19 | Express Diagnostics | Allergy Solutions System | $263,750 |
| 12 | 8/12/19 | Express Diagnostics | Allergy Solutions System | $134,500 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B) and Section 2.

## FORFEITURE ALLEGATIONS

1.      The allegations contained in Counts 1 through 12 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture against the defendants, REYAD SALAHALDEEN, MOHAMAD MUSTAFA, and TRAVORES WILLS.

## Forfeiture Allegation as to Count 1

2.      Upon conviction of the conspiracy offense in violation of Title 18, United States Code, Section 1349 alleged in Count 1 of this Indictment, the defendant,

REYAD SALAHALDEEN,

shall forfeit to the United States:

a.      As to the conspiracy to violate Title 18, United States Code, Section 1347, pursuant to Title 18, United States Code, Section 982(a)(7), all property, real and personal, the defendant obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the conspiracy to violate Title 18, United States Code, Section 1347, and all property traceable to such property; and

b.      As to the conspiracy to violate Title 18, United States Code, Section 1343, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, the defendant obtained that constitutes or is derived from proceeds traceable to the commission of the conspiracy to violate Title 18, United States Code, Section 1343, and all property traceable to such property,

including, but not limited to, all right, title, and interest of the defendant in the following real properties:

(i)      2628 Bonar Hall, Duluth, Georgia 30097;

  (ii)  708 Salobore, Cibolo, Texas 78108;

  (iii)  2746 Painted Sunrise Trail, Houston, Texas 77045; and

  (iv)  Tract 102-114, Buchanan Street, Bremen, Georgia 30110

(hereinafter the "Specific Properties").

## Forfeiture Allegation as to Counts 2 through 12

3.  Upon conviction of one or more of the Federal health care offenses, as defined in Title 18, United States Code, Section 24, alleged in Counts 2 through 12 of this Indictment, the defendants,

REYAD SALAHALDEEN,
MOHAMAD MUSTAFA, and
TRAVORES WILLS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), all property, real and personal, obtained by the defendants that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offense(s), including, but not limited to, all right, title, and interest of the defendants in the Specific Properties.

## Substitute Assets Provision

4.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

  a.  cannot be located upon the exercise of due diligence;

  b.  has been transferred or sold to, or deposited with, a third person;

  c.  has been placed beyond the jurisdiction of the Court;

  d.  has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of defendants REYAD SALAHALDEEN, MOHAMAD MUSTAFA, and TRAVORES WILLS up to the value of the forfeitable property described above.

A True Bill,

_____
Foreperson

_____
CRAIG CARPENITO
United States Attorney

DANIEL KAHN
Acting Chief, Health Care Fraud Unit
Criminal Division, Fraud Section

JACOB FOSTER
Assistant Chief
Criminal Division, Fraud Section

_____
REBECCA YUAN
GARY A. WINTERS
Trial Attorneys
Criminal Division, Fraud Section

CASE NUMBER: _____

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

**REYAD SALAHALDEEN,**
**MOHAMAD MUSTAFA, and**
**TRAVORES WILLS**

## INDICTMENT FOR

**18 U.S.C. §§ 1349, 1347, 371, 2**
**42 U.S.C. § 1320a-7b**

A true bill,

_____
Foreperson

CRAIG CARPENITO
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

REBECCA YUAN
TRIAL ATTORNEY
(202) 262-3520